UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TYLER JAMES CAMPBELL,<br><br>  Plaintiff,<br><br>  v.<br><br>KLINT STANDER, CCA WESTERN PROPERTIES, INC. DBA CORRECTION CORPORATION OF AMERICA, JOSEPH P. CARDOVA, TOM KESSLER, TIMOTHY WENGLER, ACE THACKER, DAVID AGLER, AND DOES I-IX,<br><br>  Defendants. | Case No. 1:12-cv-00212-BLW<br><br>MEMORANDUM DECISION AND ORDER |

# INTRODUCTION

Before the Court is defendants Tom Kessler and Ace Thacker's motion for summary judgment. *See* Dkt. 20. These defendants also move to strike portions of plaintiff's expert report, *see* Dkt. 27, and plaintiff has moved to strike expert testimony as well. *See* Dkt. 23. For the reasons explained below, the Court will grant summary judgment in defendants' favor. The Court will grant defendants' motion to strike and will deny the plaintiff's motion to strike.

# FACTS

Tyler Campbell was incarcerated at the Idaho Correctional Center from October 6, 2009 through December 16, 2011. On January 16, 2010, he injured his left wrist.[1] *Campbell Dec.*, Dkt. 22-2, ¶ 4. He had three surgeries on his wrist while incarcerated, and a fourth after he was released. He claims that the prison repeatedly delayed treating him, which caused pain, necessitated multiple surgeries, and significantly worsened his outcome.

The prison began treating Campbell's wrist on February 9, 2010, when Dr. Klint Stander examined Campbell. Dr. Stander ordered x-rays, prescribed pain medication, and ordered a consultation with an orthopedic specialist. *Agler Decl.*, Dkt. 20-3, ¶ 10.

## 1.    Campbell's First Surgery

On March 22, 2010, Campbell saw hand specialist Dr. Troy Watkins. Dr. Watkins concluded that surgery was necessary and, according to Campbell, he said it was "time sensitive." *Campbell Dec.*, Dkt. 22-2, ¶ 8. Afterward, Campbell says he waited for surgery to be scheduled but nothing happened. *Id.* ¶ 9. In May, 2010, about six week after seeing Dr. Watkins, Campbell submitted a concern form stating:

> My left wrist has been broken for several months. I was taken
> downtown where a doctor explained how serious and time sensitive the

---

[1] The parties dispute how the injury occurred. Campbell says he fell. *Campbell Dec.*, Dkt. 22-2, ¶ 4. The prison says Campbell injured his hand in a fight. *See Dr. Stander's Notes, Ex. A to Agler Dec.*, at 61). This dispute, however, is not relevant to this motion.

injury is. And it necessitates surgery and screws. That was 6-8 weeks
ago. When am I to get this fixed[?] I fear that irreparable damage is
being done due to a lack of care.

*May 4, 2010 ICC Offender Concern Form,* Dkt. 20-8, at 2.

Two days later, on May 6, 2014, Dr. Watkins faxed his surgery recommendation to the prison. *See Ex. A to Agler Dec.,* at 165-68.[2] Campbell had surgery on May 25, 2010. *See Agler Dec.*, Dkt. 20-3, ¶ 12.

Campbell's immediate post-operative care included several visits by prison nursing staff and doctors and prescriptions to manage pain and prevent infection. *See Defendants' SOF,* Dkt. 20-2, ¶ 6; *Agler Dec.* ¶ 13. Additionally, on June 21, 2010, Campbell had a follow-up visit with Dr. Watkins. Campbell's wrist was apparently healing at that point, though Dr. Watkins wanted to see Campbell again in two weeks, which would have been during the first week of July 2010.

Campbell was not seen, however, until August 23, 2010. During that visit, Dr. Watkins asked for another follow-up – this time within three weeks, or in mid-September 2010. Once again, however, there was a delay: Campbell did not see Dr. Watkins again until nearly six months later – in February 2011.

Dr. Agler, who is the prison's Medical Director and Lead Physician, says the reason for this delay is that Dr. Watkins did not send his consultation notes to the prison.

---

[2] This sealed exhibit has not been scanned into the Court's electronic docket. *See* Dkt. 20, noting that Exhibit A is held in the Clerk's office.

**MEMORANDUM DECISION AND ORDER - 3**

*See SOF* ¶ 16; *Agler Dec.* ¶ 14. Campbell has not challenged Dr. Agler's testimony on this point. Further, despite the lengthy delay between visits to Dr. Watkins, it does not appear that Campbell asked about the delay in scheduling the follow-up, though he did complain about being in extreme pain in a December 13, 2010 health services request. *See Dec. 13, 2010 Health Services Request Form, Ex. A to Campbell Dec.*,[3] at TC000305. In early January 2011, Dr. Stander prescribed Percogesic for pain and ordered a wrist x-ray. *See Ex. A to Agler Dec.* at 60. The x-ray report indicated that the screw in Campbell's wrist was "in excellent position and appears intact." *Id.* at 44. The report further indicated that there was "no acute bony abnormality." *Id.*

2.  **Campbell's Second Surgery**

During his February 9, 2011 follow-up with Dr. Watkins, Campbell learned he would need a second surgery. *Agler Dec.* ¶ 16. A month after this visit, Campbell submitted a concern form stating, "It took 5 months to get my last surgery. I pray that is not the case this time." *Mar. 11, 2011 ICC Offender Concern Form*, Dkt. 20-8, at 4.

Campbell had his second surgery on March 15, 2011 – four days after sending in this concern form. *Agler Dec.* ¶ 17. A prison doctor and various prison nurses attended to Campbell during the weeks following this surgery. *See Agler Dec.* ¶¶ 17-18. Additionally, Campbell saw Dr. Watkins on March 23, 2011, for a post-operative

---

[3] This exhibit is not contained in the Court's electronic docket. *See* Dkt. 22 (noting that the disk containing this exhibit is being held in the Clerk's office).

evaluation. Dr. Watkins placed Campbell's wrist in a cast and asked to see Campbell back in a week. Once again, though, the prison says Dr. Watkins did not provide his treatment notes, which delayed the follow-up. *See Agler Dec.* ¶ 17. This time, the delay was not so lengthy; Campbell saw Dr. Watkins on April 18, 2011 – roughly four weeks after his previous visit. Additionally, a few days before that follow-up, the prison responded to Tyler's complaints of pain and infection by prescribing pain medications and medications to ward off infection. *See Agler Dec.* ¶ 18.; *Apr. 14, 2011 Health Services Request, Ex. A to Campbell Dec. at TC000306.*

At the April 18 follow-up visit, Dr. Watkins said the pins in Campbell's wrist should come out. Dr. Agler received this recommendation on April 27 and, and Dr. Watkins removed the pins one month later, on May 27, 2011. *Agler Dec.* ¶ 19.

In the days leading up to the May 27, 2011 appointment, Campbell submitted several concern forms, including five addressed to defendant Thacker, who is the prison's health services administrator. *See* Dkt. 20-8 at 6-10. Apparently, by May 19, 2011, Campbell had three pins coming out of his wrist. He said he feared infection and "lasting crippling effects." Dkt. 20-8, at 6. On May 22, 2011, Campbell indicated that one of the wrist pins "fell half way out of my hand today. I put it back in the best I could. I think these need to come out its been about 6-8 weeks past when they should of been removed. I sure wish someone would help me." Dkt. 20-8, at 9. And in his May 24, 2011 concern form to Thacker, Campbell said, "Well, I'm now officially out of gauze and ointment to help myself to prevent infection. I guess you're all done with me. This will be the last

kite I write you. FYI I still have the 3 pins coming out of my hand dripping pus and blood and some hand fat." Dkt. 20-8, at 10.

Campbell received responses to all but one of these concern forms. Thacker responded to two of the concern forms on May 26, 2011 – the day before Dr. Watkins removed the pins. The other two responses were given in June 2011. Both responses indicate that the problem had been handled. *Id.* at 6, 9.

Things remained relatively quiet for about a month after Dr. Watkins removed the pins. Campbell was sent back to see Dr. Watkins on June 16, 2011. *See Ex. A to Campbell Dec. at TC00433.* Dr. Watkins ordered a CT scan, which was taken on August 1, 2011.

Campbell submitted another round of concern forms in the weeks preceding the CT scan, expressing increasing frustration that the CT scan had not been scheduled. On June 26, 2011, for example – ten days after learning he needed a CT scan – Campbell stated, "Mr. Thacker, we both know that the lack of medical attention is directly connected to the need of a surgery on my wrist. . . . You assured me in our conversation that you would no longer allow me to go unattended. Please sir make sure I get these next appointments scheduled. Thanks." *June 26, 2011 ICC Offender Concern* Form, Dkt. 20-8, at 12. Thacker responded within two days, letting Campbell know that the "CT scan has been requested and we are awaiting outside approval prior to scheduling. Once that is obtained we will get the CT scan soon after." *Id.* at 11. *See also July 22, 2011 Concern Form,* Dkt. 20-8, at 15 (Campbell complains of being "mixed up, forgotten, or

neglected" given that no CT scan had been scheduled; the undated response indicates that an appointment had been scheduled). As noted, Campbell had the CT scan on August 1, 2011.

3. **Campbell's Third Surgery**

In mid-September 2011, Campbell saw Dr. Watkins again, and learned he would need a third surgery. *Campbell Dec.* ¶ 22. He had that surgery on October 4, 2011 and was housed in the ICC medical infirmary for three weeks afterward, receiving daily treatment by ICC medical staff. In addition to receiving pain medication, Campbell was given whirlpool therapy to help him heal. *Agler Dec.* ¶ 25. After his release from the medical infirmary, Campbell was monitored or treated by ICC medical staff on a near-daily basis until he was released from prison on December 16, 2011. *Id.* ¶ 26 (Campbell was monitored and treated on November 1, 3, 5, 7, 8, 11, 13-23, 25-27, 29-30, 2011; and December 4-7, and 9-16, 2011).

## THE LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

## ANALYSIS

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Plaintiff asserts that Thacker and Kessler have violated his Eighth Amendment right to adequate medical care in prison. As already noted, Thacker is the prison's health services administrator. Kessler is an assistant warden.

**1.     The Governing Legal Standard**

To maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (*quoting Estelle v. Gamble*, 429 U.S. 97 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,' " and (2) "the defendant's response to the need was deliberately indifferent." *Id.*

Deliberate indifference is shown by "a purposeful act or failure to respond to a

prisoner's pain or possible medical need, and harm caused by the indifference." *Id*. Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.*

Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).

Further, to demonstrate deliberate indifference, a prisoner must allege facts sufficient to indicate a culpable state of mind on the part of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The deliberate indifference standard is a higher standard than gross negligence. *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir.1989). The standard is met when it can be shown that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837-838 (1994).

Mere indifference, medical malpractice or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab.*, 622 F.2d 458, 460 (9th Cir.1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). If the defendants are able to show that medical personnel have been

"consistently responsive, to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of injury," summary judgement in favor of the defendants is proper. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

2.  **Serious Medical Need**

In this case, it is undisputed that the first prong of the test is satisfied. Plaintiff had a "serious medical need" by having a fractured wrist, for which he received three different surgeries while incarcerated. The question is whether Defendants Thacker and Kessler were deliberately indifferent in responding to Campbell's medical need.

3.  **Deliberate Indifference**

    A.  **Plaintiff's Claims Against Thacker**

Turning first to defendant Thacker, Campbell contends he is liable as a supervisor, given that he does not provide medical care. Supervisors can be liable in a § 1983 claim for deliberate indifference if they directly participated in or had "knowledge of and acquiesce[d] in unconstitutional conduct by his or her subordinates." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). A supervisor may also be liable in his individual capacity "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1208.

Campbell's arguments regarding Thacker's alleged deliberate indifference are mostly quite general, but he does focus on Thacker's alleged failure to timely schedule

his first surgery, which was in May 2010. The problem with this argument is that Thacker did not begin working at ICC until August 2010. *See Supp. Thacker Dec.*, Dkt. 24-1, ¶ 2. Thacker was at the prison for the remainder of Campbell's stay at ICC, but the evidence does not support a finding that he was deliberately indifferent to Campbell's needs during that time frame.

Medically speaking, the first significant thing that happened to Campbell after Thacker's arrival was Dr. Watkin's August 23, 2010 visit with Campbell. This was the visit where Dr. Watkins asked to see Campbell again in three weeks, but Campbell was not sent back for nearly six months. There is no evidence, however, that Thacker was aware of Dr. Watkins' request to see Campbell again in three weeks. To the contrary, the prison says that Dr. Watkins did not forward his treatment notes to the prison. Additionally, Campbell apparently remained silent during much of this delay; he did not ask for medical treatment until December 2010 – nearly four months after Dr. Campbell asked to see him back in six months. The prison responded to this December 2010 request; Campbell was seen by a prison doctor; his wrist was x-rayed; and he was seen by a nurse practitioner. And he was later sent to see Dr. Watkins.

Under these circumstances, a reasonable juror could not find that Thacker was deliberately indifferent to Campbell's serious medical needs during the period between Thacker's August 2010 arrival and Dr. Watkins' February 2011 follow-up visit.

Regarding Campbell's remaining ten months at the prison – he was released in December 2011 – there again is no evidence to support a deliberate-indifference finding

as to Thacker.  To be sure, when Dr. Watkins requested some action – such as a follow-up visit or a CT scan, for example – a few weeks would often pass before Campbell was treated.  For example, on June 16, 2011, Dr. Watkins ordered a CT scan, and that CT scan was not performed until August 1, 2011.  There is no evidence, however, showing that prison had been told that the CT scan needed to be performed immediately or within any particular time frame.

As another example, Campbell saw Dr. Watkins on September 12, 2011, and Dr. Watkins said Campbell would need another surgery.  That surgery was performed roughly three weeks later, on October 4, 2011.  Once again, though, there is nothing in the record showing that Dr. Watkins indicated to the prison that this was emergency surgery, or that the surgery had to be performed within any particular time frame.

In sum, while it is undisputed that the prison did not immediately perform the treatments Dr. Watkins ordered, there is nothing to show that the delay between any given order and any given treatment somehow amounts to a constitutionally deficient medical care.  The Court will therefore grant summary judgment in Thacker's favor on Campbell's § 1983 claim.

B. **Plaintiff's Claims Against Kessler**

The Court will also grant summary judgment in Kessler's favor.  As already noted, Kessler is an assistant warden at the prison.  His role in medical care is limited to participating in the concern form and grievance process.  In May 2010, Campbell addressed one concern form to Kessler about his wrist.  *See ICC Offender Concern*

*Form¸* Dkt. 20-8, at 3. He stated

> My wrist has been broken for several months. I was taken downtown to get it repaired. They told me how serious and time sensitive the surgery is. That was the last I ever saw him. That was 3 months ago! Every time I try to get to the bottom of this the buck gets passed. And I go day after day, week after week, and sadly enough month after month with the pain and . . . [inconvenience] of a broken wrist. Please Help Me!"

*Id.*

Kessler says he never saw this concern form, although a prison staff member signed for it. But even assuming that he received the concern form, and then failed to provide a written response, this failure would not be enough to hold Kessler individually liable because Campbell was being treated immediately before and after he sent this form. Within nine or ten days of sending this form, Campbell had surgery on his wrist. Additionally, Campbell was seen by prison medical staff on May 16, 18, 21, and 27. On these facts, no reasonable juror could conclude that Kessler was deliberately indifferent to Campbell's serious medical needs. *Cf. Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) ("Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.").

Campbell also argues that Kessler must have been aware of his medical needs based on the fact that "he had a gaping, bleeding, oozing hole in his arms, he had pins sticking out of his arms for months, he continually submitted written health requests – including requests directed to both Thacker and Kessler – related to his pain and need for treatment, and he was scheduled for three different surgeries." *Response,* Dkt. 22, at 17.

But even assuming, for the sake of argument, that Campbell was receiving deficient medical care, it is not reasonable to infer that an assistant warden would be alerted to this fact merely because a single prisoner within the population was walking around with a hand injury and had surgical pins sticking out of his hand at some point between his many medical treatments. *See, e.g. Allen v. Scribner,* 812 F.2d 426, 438 (9th Cir. 1987) ("There is a difference between inferring and guessing. We have no business engaging in guessing."); *Neely v. St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 346 (9th Cir.1978) (summary judgment against plaintiff affirmed where jury would have to rely "upon surmise and speculation.").

4.      **The Motions to Strike**

As for the motions to strike, the Court will grant defendants' motion to strike portions of Campbell's expert report, given Campbell's failure to oppose the motion. *See* D. Idaho Local R. 7.1(e) (failure to respond may be deemed consent to granting the motion).

The Court will deny Campbell's motion to strike Dr. Agler's and Dr. Wyatt's declarations. Campbell says the defendants did not file expert reports, and are now improperly attempting to introduce expert opinion through Dr. Agler and Dr. Wyatt. But these doctors are Campbell's treating physicians. And as defendants point out, treating physicians are typically considered fact witnesses for which no expert witness disclosure and report is required. Instead, they are simply fact witnesses of the treatment rendered. *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 824 (9th Cir. 2011). This

argument is persuasive and Campbell offered no reply to it. The Court will therefore deny his motion to strike.

## ORDER

**IT IS ORDERED that:**

(1) Defendants' Motion for Summary Judgment (Dkt. 20) is **GRANTED**.

(2) Plaintiff's Motion to Strike Expert Testimony (Dkt. 23) is **DENIED.**

(3) Defendants' Motion to Strike Portions of Plaintiff's Expert Report (Dkt. 27) is **GRANTED.**

DATED: March 11, 2014

_____
B. Lynn Winmill
Chief Judge
United States District Court